```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                    EASTERN DIVISION
```

Scott Locke,                          :

      Plaintiff,              :

  v.                                  :   Case No. 2:16-cv-39

                                        :   Magistrate Judge Kemp
Commissioner of Social Security,

      Defendant.              :

## OPINION AND ORDER

### I. Introduction

Plaintiff, Scott Locke, filed this action seeking review of a decision of the Commissioner of Social Security denying his applications for disability insurance benefits and supplemental security income. Those applications were filed on May 7, 2010, and alleged that Plaintiff became disabled on December 31, 2007.

After initial administrative denials of his claim, Plaintiff was given a hearing before an Administrative Law Judge on July 2, 2012. In a decision dated November 21, 2012, the ALJ denied benefits. That became the Commissioner's final decision on November 13, 2015, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on March 21, 2016. Plaintiff filed a statement of specific errors on June 10, 2016, to which the Commissioner responded on September 26, 2016. Plaintiff did not file a reply brief, and the case is now ready to decide.

### II. Plaintiff's Testimony at the Administrative Hearing

Mr. Locke was 45 when the administrative hearing was held. He has a high school education. He testified to the following at the administrative hearing (see Tr. 34-54).

Plaintiff was first asked what his most serious medical

problem was; he responded that it was his feet or his eyesight. His eyes had been an issue for several years, and he had been unable to see out of one of his eyes for some months. His feet would swell during the day and he needed to be able to move them around. Plaintiff also testified to shortness of breath when walking up two or three flights of stairs or pushing a lawn mower, and to numbness in his right hand, especially in cold weather.

He was also asked to describe a normal day in 2010 (which was the year he filed his applications). Plaintiff said that he would get his children ready for school because his wife was working. He would then do household chores including sweeping, doing dishes, and doing laundry. Plaintiff was also able to drive to the store to shop for groceries, help his children with homework, and take his children to activities. He could prepare the evening meal as well.

### III.  The Medical Records

The medical records in this case are found beginning on page 238 of the administrative record. The Court will summarize those records which pertain to Plaintiff's five statements of error.

Plaintiff was diagnosed in September, 2010 as having had a myocardial infarction. An echocardiogram showed no wall motion abnormalities and an ejection fraction of 50%. Plaintiff was discharged with other diagnoses as well, including hypertensive urgency, diabetes, and anxiety. (Tr. 241). He continued to see his cardiologist, Dr. Pool, for treatment of those various conditions throughout 2011, but did not report any significant heart-related problems. He also was treated for diabetes during this time frame.

Dr. Pool did a stress test in January, 2012. The results showed no inducible ischemia and a post-stress injection fraction of 44% with mildly reduced global left ventricular function.

(Tr. 386-87).

In 2012, Plaintiff saw a retina specialist. He reported floaters in his left eye and some leakage in his right eye. (Tr. 389-96). He underwent surgery on February 23, 2012, for a vitreous hemorrhage and a retinal tear. (Tr. 405). Later in 2012 he had a retinal tear in his left eye.

On April 27, 2012, Pamela Suver, a certified nurse practitioner, filled out a physical capacity evaluation form. She said that Plaintiff could stand, walk, or sit for only fifteen minutes at a time, could lift ten pounds occasionally, could not use his feet for repetitive movements, could only occasionally bend or climb steps, could never climb ladders, crawl, or squat, and would miss more than three days of work per month, all due to diabetic neuropathy and heart disease. (Tr. 409-410).

The remaining records show that Plaintiff was treated by a podiatrist for foot issues caused by his diabetic neuropathy. The condition was described as moderate to severe.

State agency reviewers also expressed opinions about Plaintiff's functional capacity. The short version of those opinions is that, as of May 24, 2011, the state agency doctors thought that Plaintiff could do a relatively full range of light work. See, e.g., Tr. 108-110.

### IV. The Medical Expert Testimony

Dr. Jonathan Nusbaum testified at the administrative hearing as a medical expert. His testimony begins at page 54 of the record.

Dr. Nusbaum was first asked to identify the medical impairments which were documented in the records. He said that Plaintiff suffered from juvenile diabetes under poor control, microalbuminemia, hypertension, premature coronary artery disease, a myocardial infarction that occurred in September,

2010, diabetic retinopathy, and diabetic neuropathy.  Dr. Nusbaum also testified that none of these impairments were severe enough to satisfy any section of the Listing of Impairments.

Next, Dr. Nusbaum provided an evaluation of Plaintiff's residual functional capacity.  He said that Plaintiff could lift only ten pounds occasionally, could sit for two hours at a time and up to six hours in a workday, could stand or walk for fifteen minutes at a time and no more than two hours in total, and could perform stooping, squatting, and crouching for less than ten percent of the time.  Also, he could not climb ladders, use foot controls, or work in a cold environment.  Dr. Nusbaum did not believe that it was necessary for Plaintiff to keep his feet elevated.

### V.   The Vocational Testimony

Dr. Oestreich was the vocational expert in this case.  His testimony begins at page 60 of the administrative record.

Dr. Oestreich first testified that Plaintiff's past relevant work included being a laborer in two settings, which was medium to heavy unskilled work, being a janitor, which was medium and unskilled, and being a retail salesperson, which was light and semi-skilled.

Dr. Oestreich was then asked to testify about a hypothetical individual who had the physical limitations described by Dr. Nusbaum.  He said that such a person could not do any of Plaintiff's past jobs because they all required more than sedentary work ability.  He did, however, testify that  someone so limited could perform about 75% of unskilled sedentary jobs in the economy, including jobs like hand packer, inspector, and assembler.  If the person had to stand every fifteen minutes, however, that would preclude employment.

### VI.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 13-

23 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012.  Next, the ALJ found that he had not engaged in substantial gainful activity since his alleged onset date of December 31, 2007.

Going to the next step of the sequential evaluation process, the ALJ determined that Plaintiff had multiple severe impairments including insulin dependent diabetes mellitus with diabetic neuropathy and proliferative diabetic retinopathy; status post vitreous hemorrhage in the left eye; hypertensive retinopathy in both eyes; status post myocardial infarction; status post vitrectomy; hypothyroidism; and premature coronary artery disease.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the sedentary exertional level except that he could lift ten pounds only occasionally, could sit for two hours at a time and up to six hours in a workday, could stand or walk for fifteen minutes at a time and no more than two hours in total, could perform stooping, squatting, and crouching for less than ten percent of the time, could not climb ladders or use foot controls, and could not work in an environment where the temperature was lower than 40 degrees Fahrenheit.  These restrictions had existed since May 1, 2010.

The ALJ next concluded that Plaintiff, with these limitations, could not do any of his past relevant work.  However, Plaintiff could do 75% of the sedentary jobs in the

economy, and could specifically perform the jobs of assembler, hand packer, and inspector. The ALJ further found that these jobs existed in significant numbers in the regional and national economies. Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VII.    Plaintiff's Statement of Specific Errors

Plaintiff raises five issues in his statement of errors: (1) the ALJ did not give proper weight to the functional capacity assessment of the treating source; (2) the ALJ did not properly evaluate the assessment done by the nurse-practitioner; (3) the ALJ did not properly evaluate the medical evidence; (4) the ALJ's residual functional capacity finding is not supported by substantial evidence; and (5) the ALJ erred by finding that Plaintiff could perform substantial gainful activity. Each of these contentions is reviewed under the following legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d

383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Although Plaintiff has raised five seemingly separate statements of error, they are interrelated.  Consequently, the Court discusses them as a group.  For the following reasons, the Court concludes that none of them provide a basis for reversal and remand.

To summarize Plaintiff's argument, he claims that the ALJ ignored significant objective medical evidence showing that he suffered from uncontrolled diabetes, reduced ejection fraction, shortness of breath, chest tightness, reduced left ventricular function, and substantial visual impairment.  He then argues that the ALJ erred by not giving sufficient weight to the opinion from Nurse Suver, and that this case cannot be distinguished from Randazzio v. Colvin, 2014 WL 2560729 (S.D. Ohio June 6, 2014), adopted and affirmed 2015 WL 881511 (S.D.Ohio March 2, 2015), where this Court remanded the case for further proceedings because the ALJ in that case erred in the way in which a nurse practitioner's opinion was evaluated.  In response, the Commissioner disputes the claim that this case is similar to Randazzio and argues that the ALJ's evaluation and rejection of Nurse Suver's opinions was entirely proper.

The Court begins with Randazzio, since Plaintiff's argument for remand relies heavily upon that decision.  There, as here, a certified nurse practitioner completed a form on which she described the claimant's residual functional capacity.  The ALJ stated, in the administrative decision, both that the opinion of

-7-

a nurse practitioner was not entitled to controlling weight under Social Security Ruling 96-2p, and that such opinions were not "medical opinions" as defined in the applicable regulations. Randazzio, 2014 WL 2560729, *10.  This Court held that the ALJ misinterpreted the regulations, particularly 20 C.F.R. §404.1513, which explicitly states that a nurse practitioner is a "medical source," and failed to follow Social Security Ruling 06-03p, which explains how an ALJ should evaluate opinions from "other medical sources" such as nurse practitioners.  Id. at *11.  Given that conclusion, the Court held that "[t]he same factors used to evaluate medical opinions from acceptable medical sources should have been applied to the opinion" of the nurse practitioner.  Id. The case was then remanded so that could occur.

Despite Plaintiff's argument to the contrary, it is clear that the ALJ in this case did not commit the error which led the Court to remand Randazzio.  The ALJ correctly described the opinion of Nurse Suver as having come from "an unacceptable medical source," which is correct.  (Tr. 20).  The ALJ did not appear to have concluded, as did the ALJ in Randazzio, that Nurse Suver's opinion could not be given great weight, but simply stated (again correctly) that it could not be given controlling weight in the same way that an opinion from a treating, acceptable medical source could.  Consequently, Plaintiff's reliance on Randazzio is misplaced.  That does not, however, end the Court's inquiry.

Under SSR 06-03p (which the ALJ cited in the first paragraph of Section 5 of the administrative decision, see Tr. 16, but did not discuss when analyzing Nurse Suver's opinion), opinions from medical sources like nurse practitioners "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  The Ruling acknowledges that the regulatory framework does not directly address how such

-8-

opinions are to be evaluated, but notes that "medical sources such ... as nurse practitioners ... have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." Consequently, the Ruling directs ALJs to consider the same list of factors set out in 20 C.F.R. §404.1527(c) when evaluating, for example, a nurse practitioner's opinion, while recognizing that "[n]ot every factor for weighing opinion evidence will apply in every case."

There is no magic formula which an ALJ must recite when dealing with opinion evidence which comes from someone who is not an "acceptable medical source." This Court has held that SSR 06-03p

> does not create an independent regulatory duty to articulate the ALJ's reasoning in the same way required for an opinion rendered by a treating source. See, e.g., Robinson v. Comm'r of Social Security, 2012 WL 194966, *12 (N.D. Ohio Jan. 20, 2012) ("there is no controlling precedent requiring an ALJ to explicitly address written statements such as" a function report from a case manager). Rather, all that is needed is a sufficient discussion of all of the evidence of record to demonstrate that the ALJ considered the key factors of "'supportability and consistency'" in deciding how much to credit these types of reports. See Acton v. Comm'r of Social Security, 2013 WL 3761126, *5 (S.D. Ohio July 16, 2013), quoting Kerlin v. Astrue, 2010 WL 3937423, *8 (S.D. Ohio March 25, 2010), adopted and affirmed 2010 WL 3895175 (S.D. Ohio Sept. 29, 2010).

Swartz v. Comm'r of Social Security, 2014 WL 868127, *8 (S.D. Ohio March 5, 2014), adopted and affirmed 2014 WL 1343094 (S.D. Ohio Apr. 3, 2014). The same question is presented here: did the ALJ discuss all of the evidence in a way that makes clear that she both understood the factors to be used in evaluating Nurse Suver's opinion and applied them in a way that is supported by the evidence?

The actual discussion of Nurse Suver's opinion is brief.

-9-

The ALJ gave only two reasons for assigning little weight to her opinion: that it came from an unacceptable medical source, and, as to one particular part of it - the statement that Plaintiff needed to keep his feet elevated and recline frequently - the record was "devoid of evidence" to support this conclusion. (Tr. 20-21). In a footnote, the ALJ also discussed, briefly, that portion of the opinion indicating that Plaintiff would need to change positions every fifteen minutes, concluding (at least indirectly) that this restriction contradicted Dr. Nusbaum's view of Plaintiff's residual functional capacity. Id. The ALJ did not mention the supportability of other portions of the opinion nor did she discuss factors like the length of the treating relationship, how well the opinion was explained, Nurse Suver's expertise, or any of the other matters listed in SSR 06-3p.

In some cases, the failure even to acknowledge the relevant factors or apply them to an opinion from an "unacceptable medical source" could be grounds for remand, especially if that failure leads the Court to conclude that the opinion was rejected simply because the person rendering the opinion is not an acceptable medical source. That would clearly violate SSR 06-03p. However, in this case, the two specific comments made by the ALJ show that she did consider the consistency and supportability of two key parts of Nurse Suver's opinion. The balance of the administrative decision indicates that the ALJ placed the greatest reliance on Dr. Nusbaum's evaluation, preferring his conclusions to those of the state agency physicians based on his having seen a greater volume of medical evidence and having been able to take Plaintiff's testimony into account. There is no likelihood that, even if the ALJ had engaged in a more comprehensive analysis of the SSR 06-3p factors as they related to Nurse Suver's opinion, she would have credited that opinion over Dr. Nusbaum's, which she described as coming from an expert in the Social Security program and someone whose analysis was

"consistent with and supported by objective clinical and laboratory findings found in the record." (Tr. 20). Plaintiff has not attacked that finding as lacking substantial support, and the objective and clinical findings, while they do show the presence of various impairments, do not overwhelmingly suggest functional limitations inconsistent even with sedentary work. For all of these reasons, the Court concludes that the Commissioner's denial of benefits in this case must be affirmed.

## VIII. Decision

Based on the above discussion, Plaintiff's statement of errors (Doc. 16) is overruled. The Commissioner's decision denying benefits is affirmed. The Clerk is directed to enter judgment in favor of Defendant and to terminate this case.

/s/ Terence P. Kemp
United States Magistrate Judge